UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **TRACY LASHELL BLANKS,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:14-CV-303** |
| | § | |
| **CAROLYN W. COLVIN, Acting** | § | |
| **Commissioner of Social Security** | § | |
| **Administration,** | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court in this appeal from a denial of Social Security disability benefits and supplemental security income is Plaintiff's Motion for Summary Judgment (Doc. No. 9, 10).[1] Having considered the motions, all relevant filings, and the applicable law, the Court hereby **GRANTS** Plaintiff's Motion for Summary Judgment. The decision of the Administrative Law Judge is **REMANDED** to the Commissioner of the Social Security Administration for further review.

## I.    CASE BACKGROUND

### A.  Procedural Background

Plaintiff Tracy Lashell Blanks filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("the Commissioner") regarding her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act").

---

[1] All docket references are to Civil Action No. 3:14-CV-303.

1

Ms. Blanks filed an application for DBI and SSI on October 14, 2010, alleging disability since December 31, 2002. Her application was denied initially and on reconsideration. Ms. Blanks requested a hearing before an Administrative Law Judge ("ALJ") on March 31, 2011. The ALJ dismissed Ms. Blanks' request after she failed to appear at the scheduled hearing.

Ms. Blanks asked the Appeals Council to review the ALJ's dismissal. The Appeals Council granted Ms. Blanks' request for review and remanded the case to the ALJ for further proceedings after finding good cause for Ms. Blanks' failure to appear at the scheduled hearing. A hearing was held before the ALJ on May 16, 2013. Ms. Blanks appeared *pro se*. After the hearing, the ALJ found that Ms. Blanks was not disabled. Ms. Blanks requested review of this decision by the Appeals Council, but the Appeals Council denied her request. Ms. Blanks then appealed to this Court.

### B.  Factual Background

Ms. Blanks was born on September 19, 1973 and was 39 years old at the time of the hearing. (Tr. 214.) She graduated from high school in special education classes. (Tr. 58.) Although Ms. Blanks previously worked as a housecleaner for approximately eight months, she has not worked full-time in over ten years. (Tr. 60-62.)[2] At the time of the hearing, Ms. Blanks was living with a friend rent-free. (Tr. 74.)

In December 2010, Ms. Blanks was evaluated by a consultative examiner, Dr. Victor Hirsch, Ph.D., a clinical psychologist. (Tr. 322.) Dr. Hirsch conducted a clinical interview and a mental status exam, and administered the WAIS-III, an I.Q. test, and the WRAT-4, an

---

[2] Dr. Victor Hirsch's evaluation of Ms. Blanks states that she worked in housekeeping until May 2010. (Tr. 322.) This contradicts other parts of the record, including Ms. Blanks' testimony and her Certified Earning Records, which indicate that she has not worked full-time since at least 2002. (Tr. 60-62, 228.) As such, the Court understands Dr. Hirsch's notation to be a misunderstanding or a typographical error.

achievement test. (*Id.*) Ms. Blanks' scores on the WAIS-III were: Verbal I.Q.—71, Performance I.Q.—73, and Full Scale I.Q.—69. (Tr. 325.) This placed her in the mild mental retardation range. (*Id.*) Ms. Blanks' standard scores on the WRAT-4 were: reading—75, spelling—94, and arithmetic—70. (Tr. 326.) Her scores placed her in the low average range.

In addition to administering these tests, Dr. Hirsch made a number of findings. He noted that Ms. Blanks was "frequently confused with the questions [he asked] and the questions had to be phrased in different ways for her to understand and respond appropriately." (Tr. 323.) Dr. Hirsch also noted that, while Ms. Blanks is able to clean the house, prepare small meals, and shop for groceries with her mother, she has difficulty bathing and dressing herself and cannot handle her own finances. (Tr. 326.) Based on this information, Dr. Hirsch diagnosed Ms. Blanks with Borderline Intellectual Functioning ("BIF"). (Tr. 327.) Additionally, Dr. Hirsch found that Ms. Blanks' condition was going to remain the same, and that the prognosis for improvement was poor. (Tr. 326.)

Soon thereafter, Charles Lankford, Ph.D., a state agency consultant, reviewed Dr. Hirsch's evaluation and completed a psychiatric review technique form ("PRTF"). (Tr. 330.) Dr. Lankford evaluated Ms. Blanks with regards to listed impairment 12.05 from the Social Security Regulations (found at 20 C.F.R., Part 404, Subpart P, Appendix I) – intellectual disability. (*Id.*) Dr. Lankford found that Ms. Blanks had a medically determinable impairment, borderline intellectual functioning, that did not "precisely satisfy" the diagnostic criteria for Listing 12.05. (Tr. 334.) He also determined that Ms. Blanks was mildly restricted in her activities of daily living, but was moderately limited in the areas of social functioning and concentration, persistence, and pace. (Tr. 340.) He ultimately concluded that there was "insufficient evidence in [the] file to establish disability" prior to Ms. Blanks' date last insured. (Tr. 342.)

Dr. Lankford also completed a mental residual functional capacity assessment ("RFC assessment"). (Tr. 344.) Based on his review of the existing record, Dr. Lankford determined that Ms. Blanks is "able to understand, remember, and carry out only simple instructions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." (Tr. 346.)

In April 2013, Ms. Blanks was evaluated by James Simpson, M.A., a certified psychologist. (Tr. 391.) Mr. Simpson administered the WAIS-III and the Street Survival Skills Questionnaire ("SSSQ"), an adaptive behavior assessment. (Tr. 392-393.) Ms. Blanks' scores on the WAIS-III I.Q. Test were: Verbal I.Q.—60, Performance I.Q.—67, Full Scale I.Q.—59. These scores placed her in the mild range of intellectual disability. (Tr. 392.) Ms. Blanks' SSSQ quotient was 50, which placed both her present and potential adaptive behavior functioning in the mild range. (Tr. 393-394.) Based on his assessment, Mr. Simpson diagnosed Ms. Blanks with mild mental retardation. (Tr. 394.) He further noted that, because there was "no reported history of head injury, seizure disorder or other neurological insult occurring after age 18, as well as no reported decline in intellectual functioning or adaptive behavior skills since age 18," Ms. Blanks' intellectual disability has been present since birth. (*Id.*)

In July 2013, Mr. Simpson completed an impairment questionnaire, which closely tracks the RFC assessment completed by Dr. Lankford. (Tr. 399.)[3] Though the categories of functional capacities on both forms are identical, Mr. Simpson's assessment of Ms. Blanks' functioning

---

[3] Although Mr. Simpson's impairment questionnaire was not part of the record during the hearing before the ALJ, it was presented to the Appeals Council. (Tr. 6; Doc. No. 10 at 19.) Therefore, the Court may consider it as part of this review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 337-8 (5th Cir. 2005) ("Because the Appeals Council considered and evaluated such evidence, that evidence constitutes evidence upon which the decision complained of is based. Accordingly, the district court should have considered and addressed the new evidence that Higginbotham submitted to the Appeals Council.") (internal citation and quotation marks omitted).

differs significantly from Dr. Lankford's. Overall, Mr. Simpson's assessment suggests that he believed that Ms. Blanks' functional capacity is more limited than Dr. Lankford did. For example, while Dr. Lankford believed that Ms. Blanks is not significantly limited in her ability to work in coordination with or proximity to others without being distracted, Mr. Simpson concluded that Ms. Blanks would be markedly limited in this area. (*Compare* Tr. 344 *with* Tr. 402.) Consistent with his diagnosis of mild mental retardation, Mr. Simpson determined that Ms. Blanks' intellectual functioning and adaptive behavior functioning are equally impaired. (Tr. 401.) Mr. Simpson further concluded that Ms. Blanks was incapable of tolerating "even 'low stress,'" and that she would likely miss work due to her impairment more than three times a month.  (Tr. 405-406.) Like Dr. Hirsch, Mr. Simpson noted that Ms. Blanks would not be able to manage her own benefits. (Tr. 328, 406.)

In May 2014, Mr. Simpson evaluated Ms. Blanks again to develop an updated assessment of her level of functioning. (Tr. 427.)[4] Mr. Simpson opined that the results of his April 2013 evaluation, which indicated that Ms. Blanks functions within the mild range of mental retardation, remain current and valid. (Tr. 428.) He further stated that her adaptive behavior skills are consistent with someone who is functioning within the mild range of mental retardation. (*Id.*)

At a hearing in May 2013, Ms. Blanks and a vocational expert testified before the ALJ. Ms. Blanks was *pro se*. Ms. Blanks testified that she had not worked full-time in approximately ten years. (Tr. 62.) She said that she was terminated from her last full-time job as a housecleaner because customers complained that she was too slow and did not clean well, even though she was given multiple chances to improve. (Tr. 66, 70-73.) She now works occasional odd jobs,

---

[4] Like Mr. Simpson's July 2013 impairment questionnaire, this updated evaluation was not submitted to the ALJ but was presented to the Appeals Council. (Tr. 6.)

including watching her friend's cousin (age unknown). (Tr. 62, 72.) When asked by the ALJ, Ms. Blanks stated that she could babysit children, if she was able to obtain the necessary licensing. (Tr. 77.) Further, when asked if she was able to do basic housework such as laundry, dishes, and cooking, Ms. Blanks answered affirmatively. (Tr. 74-75.) Finally, Ms. Blanks told the ALJ that she had experienced her limitations consistently throughout her life. (Tr. 70.)

The vocational expert ("VE") who testified at the hearing classified Ms. Blanks' past work as "light, unskilled." (Tr. 61.)[5] The ALJ asked the VE to opine on whether an individual with Ms. Blanks' age, education, and work experience could perform her past work if she had the following limitations: only understand, remember, and carry out short, simple instructions while performing only routine, repetitive tasks, not in a fast-paced production type environment, and only simple decision-making. (Tr. 83-84.) The VE answered affirmatively. The ALJ then added to this hypothetical the condition that the individual would be off-task more than 20% of the time during the workday. (Tr. 84.) The VE stated that such a person could not sustain employment. (*Id.*)

## C. ALJ's Findings

The ALJ issued his decision denying benefits on June 28, 2013. (Tr. 25.) He made the following findings:

(1) Ms. Blanks met the insured status requirement through September 30, 2004. (Tr. 28.)

(2) Ms. Blanks had not engaged in substantial gainful activity since her alleged onset date of December 31, 2002. (*Id.*)

(3) Ms. Blanks' cognitive disorder was a severe impairment. (*Id.*)

---

[5] The VE testified that the Dictionary of Occupational Titles uses the title "day worker" to describe Ms. Blanks' previous housecleaning work.

(4) Ms. Blanks' impairment did not meet or medically equal any of the impairments listed

under 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 30.)

(5)  Ms. Blanks had the RFC to perform a full range of work, with the following

nonexertional limitations: "she can understand, remember, and carry out short, simple

instructions while performing only routine, repetitive tasks, not in a fast-paced production

type environment. The claimant is able to make only simple decisions." (Tr. 32.)

(6) Ms. Blanks could perform her past relevant work as a day worker. (Tr. 34.)

(7) Ms. Blanks was not disabled from her onset date through the date of his decision. (Tr.

35.)

## II.      LEGAL STANDARDS

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if no genuine

issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Importantly, "the mere

existence of some factual dispute will not defeat a motion for summary judgment; Rule 56

requires that the fact dispute be genuine and material." *Willis v. Roche Biomed. Lab.*, 61 F.3d

313, 315 (5th Cir. 1995). Material facts are those whose resolution "might affect the outcome of

the suit under the governing law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248). A court may consider any

evidence in the record, "including depositions, documents, electronically stored information,

affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However,

hearsay, unsubstantiated assertions, and unsupported speculation will not suffice to create or negate a genuine issue of fact. *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shafer v. Williams*, 794 F.2d 1030, 1033 (5th Cir. 1986); *see* Fed. R. Civ. P. 56(c)(4).

### B.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). If the Commissioner's decision satisfies both of these requirements, it must be affirmed. *Id.*

Substantial evidence is defined as "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.* District courts may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute their judgment for that of the Commissioner, even if the evidence preponderates against the Commissioner's decision. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Id.* The aim is judicial review that is deferential without being so obsequious as to be meaningless. *Id.*

Nevertheless, this standard of review is not a rubber stamp for the Commissioner's decision and involves more than a search for evidence supporting the Commissioner's findings. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985) (internal citation omitted). The substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision. *Singletary v. Brown*, 798 F.2d 818, 823 (5th Cir. 1986).

Rather, the Court must consider the record as a whole and the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Id.*

### C. Disability Determination

To be entitled to social security benefits, a claimant must demonstrate that she is disabled as defined by the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563-4 (5th Cir. 1995). A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); *see also Brown*, 192 F.3d at 497. The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled:

(1) Whether the claimant is presently engaged in substantial gainful activity;

(2) Whether the claimant has a severe impairment;

(3) Whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations;

(4) Whether the impairment prevents the claimant from performing past relevant work; and

(5) Whether the impairment prevents the claimant from performing any other substantial gainful activity.

*Brown*, 192 F.3d at 498. The claimant bears the burden of proof on the first four steps of the inquiry, but the burden shifts to the Commissioner at the fifth step. *Id.* A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

The existence of a disabling impairment must be demonstrated by medically acceptable clinical and laboratory diagnostic findings. 42 U.S.C. § 423(d)(3). A claimant is eligible for disability insurance benefits only if the onset of the qualifying impairment began on or before the date the claimant was last insured. POMS § 25501.320.

## III.    ANALYSIS

Ms. Blanks raises the following issues in her motion for summary judgment:

(1) Ms. Blanks presented sufficient evidence to be found disabled under Listing 12.05.

(2) Alternatively, remand is necessary to provide a proper evaluation of Ms. Blanks' impairments as the ALJ failed to properly consider all the relevant evidence.

(3) The ALJ failed to properly evaluate Ms. Blanks' credibility.

(4) Remand is warranted based on new and material evidence submitted to the Appeals Council.

### A.  Listed Impairment

The introductory paragraph to Listing 12.05 states:

"Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. The diagnostic description for intellectual disability therefore requires that a claimant demonstrate both subaverage general intellectual functioning and deficits in adaptive functioning. *Id.* A claimant who satisfies the diagnostic description must also demonstrate that she meets the "required level of severity," which includes,

"B. A valid verbal, performance, or full scale I.Q. of 59 or less; or

C. A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

*Id.*

Listing 12.05 itself does not explicitly define "deficits in adaptive functioning." The

Social Security Administration ("SSA") has stated that the definition of intellectual disability in

the introductory paragraph of the listing is "consistent with, if not identical to, the definitions of

[intellectual disability] used by the leading professional organizations."[6] Technical Revisions to

Medical Criteria for Determinations of Disability, 67 Fed.Reg. 20018-01, at 20022 (April 24,

2002). The SSA recognized that the four major professional organizations in the United States

that deal with intellectual disability have "each established their own definition," and noted that

"[w]hile all the definitions require significant deficits in intellectual functioning, as evidenced by

IQ scores of approximately 70 or below, age of onset and the method of measuring the required

deficits in adaptive functioning differ amongst the organizations." *Id.*; *see also Durden v. Astrue*,

586 F. Supp. 2d 828, 833-4 (S.D. Tex. 2008) (discussing two definitions of intellectual

disability). After reviewing these definitions, the SSA declined to adopt any one of them,

explaining:

> "The definition of [intellectual disability] used by SSA in the listings is not restricted to
> diagnostic uses alone, nor does it seek to endorse the methodology of one professional
> organization over another. While capturing the essence of the definitions used by the
> professional organizations, it also is used to determine eligibility for disability benefits.
> SSA's definition establishes the necessary elements, while allowing use of any of the
> measurement methods recognized and endorsed by the professional organizations."

*Id.* Thus, the adaptive functioning deficits requirement in the introductory paragraph of Listing

12.05 can be satisfied by meeting the definitions set forth by any of the four professional

organizations.

---

[6] Intellectual disability was formerly known as mental retardation.

Although the SSA has not explicitly defined "deficits in adaptive functioning," Listing 12.00 does provide criteria for assessing the "severity" required by sections (C) and (D) of Listing 12.05. 20 C.F.R. Pt. 404, Supt. P, App. 1, § 12.00(C). These criteria include "adaptive activities of daily living," (such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."), "social functioning" (including "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers,") and "concentration, persistence, or pace" (defined as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."). *Id.* at § 12.00(C)(1)-(3). Though it is not clear that the SSA intended these criteria to be synonymous with the term "deficits in adaptive functioning," some courts have considered these criteria when determining whether a claimant has the deficits in adaptive functioning required to meet Listing 12.05(C) because they overlap, to some extent, with the examples of adaptive functioning behaviors provided in the DSM-V. *See Durden*, 586 F. Supp. 2d at 834.

Applying this definition, it is clear that Ms. Blanks has not demonstrated that she is *per se* disabled under Listing 12.05. The two mental health professionals who examined Ms. Blanks, Dr. Lankford and Mr. Simpson, disagree considerably about a number of her functional capacities. (*Compare* Tr. 344-345 *with* Tr. 402 and 404.) Resolving these disagreements is central to determining whether Ms. Blanks has the requisite deficits in adaptive functioning. As it is not the role of this Court to undertake this task, *see Brown v. Apfel*, 192 F.3d at 496, the Court cannot find that Ms. Blanks is *per se* disabled under Listing 12.05.

**B.  Evaluation of Ms. Blanks' Impairments**

Although Ms. Blanks has not shown that she is *per se* disabled under Listing 12.05, intellectual disability, she has established that remand is necessary because there were errors in the ALJ's assessment of Listing 12.05. The ALJ should reconsider Ms. Blanks' Listing argument in accordance with this Order on remand.

In December 2010, Ms. Blanks' scores on the WAIS-III I.Q. Test were: Verbal I.Q.—71, Performance I.Q.—73, and Full Scale I.Q.—69. When tested again in April 2013, Ms. Blanks' scores were: Verbal I.Q.—60, Performance I.Q.—67, Full Scale I.Q.—59. The regulations have clarified that "where more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c). Ms. Blanks' lowest scores from each administration of the test were her full scale scores of 69 and 59, which place Ms. Blanks within the ranges set forth in paragraphs (B) and (C) of Listing 12.05.  Neither the mental professionals who administered the testing nor the ALJ questioned the accuracy of these scores.

Despite this evidence in the record, the ALJ made a number of surprising determinations. First, he found that there was "an absence of objective medical support for . . . mental retardation." (Tr. 29.) Second, the ALJ concluded that "there is no evidence that demonstrates or supports the impairment before age 22." (*Id.*) Since there were "no school records or other information to document a mental retardation diagnosis," the ALJ characterized Mr. Simpson's conclusion that Ms. Blanks had been intellectually disabled since birth as "ridiculous." (*Id.*) Third, based on this assessment of Mr. Simpson's conclusion, the ALJ gave "little weight" to Mr. Simpson's opinion, including his diagnosis of mild mental retardation. (*Id.*)

The ALJ's determinations are problematic, however, because they are inconsistent with a substantial body of case law finding that a claimant need not present results of I.Q. testing conducted prior to age 22 in order to establish impairment before age 22. *See e.g., Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001) (finding that there is a presumption that "IQs remain fairly constant throughout life"); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986) (adopting presumption that low I.Q. existed prior to first I.Q. test); *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) ("[T]here may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation."); *Pritchett v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-309-BF, 2012 WL 1058123, *8 (N.D. Tex. March 29, 2012) (finding persuasive the presumption that IQ scores remain stable over time); *Adams v. Astrue*, No. 4-10-CV-216-BD, 2011 WL 2550772, *3 (N.D. Tex. June 27, 2011) ("[T]here is a presumption that IQ remains stable over time."); *Helton v. Astrue*, No. 2:08-CV-79, 2011 WL 1743409, *4 (N.D. Tex. Apr. 22, 2011), rec. adopted 2011 WL 1752243 (N.D. Tex. May 6, 2011) (noting "the generally accepted principle that, absent brain injury, mental retardation is a life-long impairment"); *Durden*, 586 F. Supp. 2d at 832-3 (S.D. Tex. 2008) ("Because there is no evidence in the record suggesting that Ms. Durden's I.Q. has changed, Ms. Durden has established as a matter of law that she had 'significantly subaverage general intellectual functioning' that manifested in the developmental period."). The Fifth Circuit has not directly ruled on the issue, but "it has considered whether a defendant was mentally retarded in other contexts, relying on I.Q. testing that took place after the defendant reached the relevant age."

14

*Durden*, 586 F. Supp. 2d at 834 (citing *Morris v. Dretke*, 413 F.3d 484, 487 (5th Cir. 2005) (considering I.Q. scores obtained after the defendant was 18 years old when analyzing whether the defendant had manifested significantly subaverage intellectual functioning prior to age 18)).

Although the Fifth Circuit has not followed other circuits in expressly adopting a presumption that I.Q. remains stable over an individual's lifetime, the Court nevertheless finds this principle persuasive. Ms. Blanks' scores obtained in 2010 and 2013 presumptively establish her I.Q. prior to age 22. Nothing in the record rebuts this presumption. As the ALJ stated, there is no record of "head injury, seizure disorder, or other neurological insult occurring after age of 18, as well as no specific source of decline in intellectual functioning or adaptive behavior skills since age 18." (Tr. 29.) Ms. Blanks also testified that the symptoms of her impairment have been "about the same" throughout her life. (Tr. 69.) Since there is no evidence of an incident or condition that would cause Ms. Blanks' I.Q. to change, Ms. Blanks has established as a matter of law that she had significantly subaverage general intellectual functioning before age 22. *See, e.g.,* Diagnostic and Statistical Manual of Mental Disorders 41, 49 (4th ed., Text Revision, 2000) ("DSM–IV") (defining significantly subaverage general intellectual functioning as "an I.Q. of approximately 70 or below on an individually administered I.Q. test"). Since there was ample evidence of Ms. Blank's I.Q. in the record, the ALJ did not need her school records or her medical records before age 22 to make this determination.

The erroneous assessment of Ms. Blanks' intellectual functioning before age 22 is also problematic because it seems to have played a central role in the ALJ's decision to afford Mr. Simpson's opinion "little weight." (Tr. 29.) The ALJ offers only two reasons for discounting Mr. Simpson's testimony. First, as discussed above, the ALJ found Mr. Simpson's conclusions about Ms. Blanks' functioning before age 22 "ridiculous." (*Id.*) Second, the ALJ gave little weight to

Mr. Simpson's conclusion that Ms. Blanks was eligible for state-funded services based on Texas' definition of intellectual disability. As the latter conclusion was related only to the ultimate question of disability for the purposes of benefits, it is irrelevant here; determining disability is undoubtedly within the province of the Commissioner, not the state of Texas. *See Floyd v. Bowen*, 833 F.2d 529, 534 (5th Cir. 1987) (noting that a disability determination by another agency is entitled to great weight, but is not binding, as the criteria applied by other agencies differ from those applied by the Commissioner).

Therefore, it appears that the primary, if not the only, reason the ALJ disregarded the remainder of Mr. Simpson's diagnosis and opinion was Mr. Simpson's conclusion that Ms. Blanks' cognitive impairment had been present since birth. But, as outlined above, Mr. Simpson's conclusion is wholly consistent with the prevailing body of case law. It is the ALJ's conclusion, and not Mr. Simpson's, that is incongruent with the applicable legal standards.

Since Mr. Simpson's conclusion is not "ridiculous," but rather in accordance with the prior decisions of this Court and many others, the ALJ's decision to disregard Mr. Simpson's opinion on this basis was erroneous. This error significantly undermined Ms. Blanks' case. Mr. Simpson is one of only two examining mental health professionals whose opinions were part of the record, he is the only mental health professional to have examined Ms. Blanks more than once, and his evaluation provided the most recent medical information about Ms. Blanks' impairment. As such, his opinion is important to adducing the strength of Ms. Blanks' claim. Critically for Ms. Blanks, Mr. Simpson's diagnosis of mild mental retardation strongly supports her contention that she meets the criteria of Listing 12.05. *See Durden*, 586 F. Supp. 2d at 833-40 (discussing at length why a diagnosis of mental retardation necessarily means that the diagnosing professional found that the individual had deficits in adaptive functioning, as these deficits are

16

"an essential component of any officially recognized definition of mental retardation"). This timely and illuminating medical evidence should not have been dismissed through a misapplication of the legal standards.

In reviewing a decision by an ALJ, this Court may not re-weigh the evidence or substitute its judgment for that of the ALJ. *See Brown*, 192 F.3d at 496. But, the Court must ensure that the proper legal standards were used. *Boyd*, 239 F.3d at 704. Furthermore, an ALJ's decision "must stand or fall within the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). In light of this Court's determination that the ALJ incorrectly applied the relevant legal standards in assessing the weight of Mr. Simpson's opinion, this evidence must now be considered alongside the rest of the record.

### C. Evaluation of Ms. Blanks' Credibility

Ms. Blanks contends that the ALJ failed to properly evaluate her credibility when he determined that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Specifically, she argues that (1) the ALJ assumed that her ability to perform some activities of daily living indicated that she could perform full-time work; (2) he implied that her lack of mental health treatment was inconsistent with her allegations, but did not inquire whether there were reasons she did not seek treatment; and (3) he drew conclusions from the lack of school records while neglecting his duty to fully develop the record by requesting her special education records.

The regulations set forth a two-step process for evaluating a claimant's own description of her physical or mental impairment. SSR 96-7p; *see also* 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether there is an underlying medically determinable physical or

17

mental impairment that could reasonably be expected to produce the claimant's pain or other

symptoms. SSR 96-7p. Second, once an underlying impairment that could reasonably be

expected to produce the claimant's pain or other symptoms has been shown, the ALJ must

evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine

the extent to which the symptoms limit her ability to do basic work activities. *Id.* For this

purpose, whenever the claimant's statements about the intensity, persistence, or functionally

limiting effects of pain or other symptoms are not substantiated by objective medical evidence,

the ALJ must make a finding on the credibility of the claimant's statements based on a

consideration of the entire case record. *Id.* In recognition of the fact that a claimant's symptoms

may suggest a greater level of severity of impairment than can be shown by the objective

medical evidence alone, the regulations instruct ALJs to consider a number of factors in addition

to the objective medical evidence. *Id.* These factors include:

> (1) the individual's daily activities;
> (2) the location, duration, frequency, and intensity of the individual's pain and other symptoms;
> (3) factors that precipitate or aggravate the symptoms;
> (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and
> (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* When additional information is needed to assess the credibility of the claimant's statements

about symptoms and their effects, the adjudicator must make every reasonable effort to obtain

available information that could shed light on the credibility of the claimant's statements. *Id.*

Finally, when evaluating the credibility of a claimant's statements, the ALJ must give specific

reasons for the weight given to the individual's statements.

1.   Activities of Daily Living

The ALJ found that Ms. Blanks was able to perform a number of activities of daily living, including cooking, cleaning the house, laundry, and personal hygiene. This finding was supported in part by Ms. Blanks' testimony, her functional report, and her statements to medical professionals.[7] Based on this finding, the ALJ determined that Ms. Blanks' daily activities "reveal a significant [sic] greater functional ability than alleged." (Tr. 33.)

Ms. Blanks contends that her ability to perform some activities of daily living for limited periods of time is not necessarily evidence that she can work full-time. While this is undoubtedly true, a claimant's daily activities can shed light on the limiting effects of her impairment. Accordingly, the ALJ appropriately considered the import of Ms. Blanks' daily activities in determining the severity of her symptoms.

2.   Lack of Medical Treatment

As part of his credibility determination, the ALJ stated that "[t]he objective evidence shows that the claimant has not had any ongoing treatment with a mental health professional, and there is no evidence that she was hospitalized or was seen in the emergency room secondary to mental problems." (Tr. 33.) He noted that "[t]he regulations state that in order to be awarded benefits, an individual must follow treatment prescribed by her physician if this treatment can restore the ability to work." *Id.*; *see also* 20 C.F.R. §§ 404.1530, 416.930; SSR 82-59. Accordingly, the ALJ gave Ms. Blanks' complaints "some weight." (Tr. 33.)

_____

[7] The Court notes that the record is not wholly unambiguous. For example, in Ms. Blanks' functional report, which she completed in November 2010, she states she can pay bills, handle a savings account, and use a checkbook or money orders. (Tr. 278.) But, in December 2010, Dr. Hirsch found that Ms. Blanks could not handle her own finances, and that she reports that her mother helps her do so. (Tr. 326.)

The regulations cited by the ALJ are only tangential to Ms. Blanks' situation. Ms. Blanks' claimed medical impairment is intellectual disability. The Court is unaware of any treatment for intellectual disability that can restore an individual's ability to work full-time and, more importantly, the record is devoid of instances in which medical professionals have prescribed such treatment to Ms. Blanks. Instead, the mental health professionals who have met with Ms. Blanks' have merely referred her to other service providers for additional evaluation, (Tr. 395, 428) or community-based services (Tr. 395, 429), or have made no referrals at all. (Tr. 327.) Where a claimant has not been prescribed treatment, it is illogical to penalize her for failure to follow such treatment.

Further, the ALJ indicated that Ms. Blanks' lack of hospitalizations or emergency room visits was inconsistent with her allegations. (Tr. 33.) But, the ALJ's determination fails to recognize that there is nothing in the record which indicates that the symptoms of Ms. Blanks' impairment require hospitalization or emergency room visits. Ms. Blanks has repeatedly stated that she cannot work full-time because she is not mentally capable.  (Tr. 12, 275, 322.) Neither she nor the medical professionals who have examined her suggest that the symptoms of mental incapacity result in hospitalizations or trips to the emergency room. Thus, these are unsuitable metrics by which to gauge Ms. Blanks' credibility.

The regulations make clear that an ALJ may not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any information in the record that may explain such a failure. SSR 96-7p. Here, the record contains no indication that Ms. Blanks was prescribed a regular course of medical treatment designed treat intellectual disability. Thus, any credibility

determination based upon Ms. Blanks' failure to pursue treatment, let alone her lack of hospitalizations, is not supported by substantial evidence.

3.  <u>Failure to Develop School Records</u>

Finally, the ALJ found that "[t]here [was] also no evidence of the type of special education services she received, if any, when she was in school." (Tr. 33.) This "no evidence" determination appears to have been made in light of the fact that Ms. Blanks' school records are not part of the administrative record. (Tr. 59.) Due in part to this lack of evidence, the ALJ determined that Ms. Blanks' subjective complaints were inconsistent with the objective medical evidence. (Tr. 33.)

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. SSR 96-7p. This mandate is particularly important when a claimant is *pro se*, as Ms. Blanks was at the hearing. *See Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) ("When a claimant is not represented by counsel, the ALJ owes a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.") (internal citation omitted). Despite Ms. Blanks' consistent testimony that she was in special education, there is no evidence that the ALJ made any effort to obtain further information about her education. Instead, the ALJ acknowledged that he did not have her records, and told Ms. Blanks that he therefore could not verify her testimony:

> "Q: All right. Were you in special ed in high school? A: Yes, sir. Q: You know, I don't have any records of that. I don't know that. I have no records about your school years. That's why I tried to encourage you to go get a representative to help you out, but you didn't do it or you weren't successful in doing it, I guess, because I don't have any school records. I don't have anything that verifies for me what your status was in high school or

in your K-12 years. Do you know that? I don't have it. So I can't verify that there's what we can 'mental retardation' here."

(Tr. 58-59.) Although the ALJ later acknowledged that he did not "have reason to doubt" that Ms. Blanks was in special education, he reiterated that he had no further information about her I.Q. scores. (Tr. 59.)

While it is commendable that the ALJ encouraged Ms. Blanks to seek representation, and rescheduled a prior hearing to give her the opportunity to do so, it seems clear from the record that the ALJ did not make "every reasonable effort to obtain available information that could shed light on the credibility of [Ms. Blanks'] statements." SSR 96-7p. He repeatedly states that he lacks the records necessary to corroborate Ms. Blanks' testimony as to her special education. This lack of information later informs his credibility determination. Yet at no point did the ALJ explore the possibility of obtaining Ms. Blanks' records. The available record includes the information necessary for an educational records request, such as the name of Ms. Blanks' high school, her graduating year, her social security number, and her date of birth. Despite the availability of this identifying information, the ALJ made no effort to obtain Ms. Blanks' school records, even though they were relevant to his credibility determination.

In order to find that the ALJ's decision was not supported by substantial evidence, however, the Court must also find that the claimant was prejudiced by the ALJ's failure to adequately develop the record. *Brock*, 84 F.3d at 728. To establish prejudice, a claimant must show that "had the ALJ adequately performed his duty, he could and would have adduced evidence that might have altered the result." *Reynaud v. Astrue*, 226 F. App'x 401, 402 (5th Cir. 2007). Here, there is no basis to conclude that, had the ALJ obtained Ms. Blanks' school records, he would have changed his decision. Although it appears that the lack of school records was pertinent to the ALJ's credibility determination, the bulk of his assessment of Ms. Blanks'

credibility rests on her hearing testimony about her daily activities. Given the reliance on her testimony, this Court cannot conclude that the failure to make any effort to obtain Ms. Blanks' school records was prejudicial.

### D.  Evidence Submitted to Appeals Council

Finally, Ms. Blanks contends that this case should be remanded so the Commissioner can articulate "why the detailed opinions provided by [Mr. Simpson] were summarily rejected." (Doc. No. 10 at 19.) As discussed at length above, the ALJ's reason for according Mr. Simpson's opinion and diagnosis little weight is inconsistent with the applicable legal standards. Since this matter is being remanded for reconsideration of Ms. Blanks' Listing argument in accordance with this Order, the Court need not reach Ms. Blanks' final argument.

### IV.    CONCLUSION

Plaintiff's Motion for Summary Judgment is **GRANTED**. This case is remanded to the ALJ.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas on this the 11th day of May, 2015.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE